**2026 WI 20**

# Supreme Court of Wisconsin



KONKANOK RABIEBNA, et al.,
*Plaintiffs-Appellants,*

*v.*

HIGHER EDUCATIONAL AIDS BOARD, et al.,
*Defendants-Respondents-Petitioners,*

No. 2022AP2026
Decided June 18, 2026

REVIEW of a decision of the Court of Appeals
Jefferson County Circuit Court (William F. Hue, J.) No. 2021CV137

ANNETTE KINGSLAND ZIEGLER, J., delivered the majority opinion of the Court, in which REBECCA GRASSL BRADLEY, BRIAN K. HAGEDORN, and JANET C. PROTASIEWICZ, JJ., joined, and in which JILL J. KAROFSKY, C.J., and REBECCA FRANK DALLET and SUSAN M. CRAWFORD, JJ., joined with respect to ¶¶17–20. JILL J. KAROFSKY, C.J., filed a concurring opinion, in which SUSAN M. CRAWFORD, J., joined. REBECCA FRANK DALLET, J., filed a concurring opinion, in which JILL J. KAROFSKY, C.J., and SUSAN M. CRAWFORD, J., joined.

¶1 ANNETTE KINGSLAND ZIEGLER, J. This is a review of a published opinion of the court of appeals, *Konkanok Rabiebna, et al. v. Higher Educational Aids Board, et al.*, 2025 WI App 24, 416 Wis. 2d 44, 20 N.W.3d 742, reversing the Jefferson County circuit court's order which held that WIS.

STAT. § 39.44 (2023–24)[1] is constitutional under the Equal Protection Clause of the Fourteenth Amendment. Section 39.44 creates the Minority Undergraduate Retention Grant Program (the "Grant Program"), which provides financial aid to students attending Wisconsin private and technical colleges who belong to specified race-, national origin-, ancestry-, or alienage-based groups.

¶2      Plaintiffs-Appellants Konkanok Rabiebna, Richard A. Freihoefer, Dorothy M. Borchardt, Richard Heidel, and Norman C. Sannes (collectively hereinafter "the Taxpayers") filed a declaratory action with the Jefferson County circuit court seeking to enjoin Wisconsin's Higher Educational Aids Board and Tammie DeVooght-Blaney (collectively hereinafter "HEAB") from administering the Grant Program. The Taxpayers argued that the Grant Program violates the Equal Protection Clause of the Fourteenth Amendment by impermissibly limiting eligibility to students who belong to specified racial, national origin, ancestry, or alienage-based groups. The circuit court upheld the statute, concluding that under *Grutter v. Bollinger*, 539 U.S. 306 (2003), and its progeny, fostering diversity in higher education is a compelling state interest, and the Grant Program is narrowly tailored because it provides modest, need-based aid to students from groups with disproportionately high attrition rates. The Taxpayers appealed.

¶3      While the appeal was pending, the United States Supreme Court issued its decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) (hereinafter "*SFFA*"). Applying *SFFA*, the court of appeals reversed the circuit court, holding that attaining diversity in higher education is no longer a compelling interest, and that the Grant Program was not narrowly tailored to fulfill those ends. The court of appeals remanded to the circuit court with directions to enjoin HEAB from administering the Grant Program. HEAB appealed asserting that the legislature has a compelling interest in equalizing education opportunities for certain students of specifically identified racial, national origin, ancestry, or alienage-based groups in Wisconsin's private and technical colleges. Regardless, HEAB argued that the Taxpayers lack standing to challenge the Grant Program since they have not demonstrated

---

[1] All subsequent references to the Wisconsin Statutes are to the 2023–24 version unless otherwise indicated.

a particularized, pecuniary injury associated with the Grant Program's administration.

¶4      We conclude that the Taxpayers have standing and that the Grant Program violates the Equal Protection Clause of the Fourteenth Amendment. Accordingly, we affirm the court of appeals' decision that the statute is unconstitutional and conclude that HEAB is enjoined from operating the Grant Program.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

¶5      The Grant Program is a financial need program that provides grants to particular race-, national origin-, ancestry-, or alienage-based groups of students. HEAB administers the Grant Program.

¶6      In 1985, Wisconsin's legislature enacted WIS. STAT. § 39.44 (1985–86) to provide taxpayer-funded grants through the Grant Program for "Black American," "American Indian," and "Hispanic" undergraduate students enrolled in Wisconsin private, nonprofit universities and colleges. 1985 Wis. Act 29, § 722m. In 1987, the legislature expanded the Grant Program to a student "admitted to the United States after December 31, 1975, and who either is a former citizen of Laos, Vietnam or Cambodia or whose ancestor was or is a citizen of Laos, Vietnam or Cambodia," and to students attending Wisconsin's technical colleges. WIS. STAT. § 39.44 (1987–88); 1987 Wis. Act 27, §§ 683r, s. The statute, entitled "Minority undergraduate grants," provides:

(1)(a) In this section "minority undergraduate" means an undergraduate student who:

1.  Is a Black American.

2.  Is an American Indian.

3.  Is a Hispanic, as defined in s. 16.287(1)(d).

4. Is a person who is admitted to the United States after December 31, 1975, and who either is a former citizen of Laos, Vietnam or Cambodia or whose ancestor was or is a citizen of Laos, Vietnam or Cambodia.

(b) There is established, to be administered by the board, the minority undergraduate retention grant program for minority undergraduates enrolled in private, nonprofit higher educational institutions in this state or in technical colleges in this state.

(2) Funds for the grants under this section shall be distributed from the appropriation under s. 20.235(1)(fg), with 50 percent distributed to the eligible private institutions and 50 percent distributed to the eligible technical colleges. The board shall audit the enrollment statistics annually.

(3) An institution or school receiving funds under sub. (2) shall:

(a) Award grants to eligible students on the basis of financial need.

(b) Demonstrate to the satisfaction of the board that such funds do not replace institutional grants to the recipients.

(c) Annually report to the board the number of awards made, the amount of each award, the minority status of each recipient, other financial aid awards made to each recipient and the total amount of financial aid made available to the eligible students.

Wis. Stat. § 39.44(1)–(3).[2]

---

[2] The remaining portion of the statute states:

(4) The board shall notify an institution or school receiving funds under sub. (2) if a student's name appears on the statewide support lien docket under s. 49.854(2)(b). An institution or school may not award a grant under this section to a student if it receives a notification under this subsection concerning that student, unless the student provides to the institution or school a payment agreement that has been approved by the county child support agency under s. 59.53(5) and that is consistent with rules promulgated under s. 49.858(2)(a).

¶7    Additionally, grant eligibility requires the student to also be: a citizen or permanent resident of the United States; a Wisconsin resident; and "enrolled as a sophomore, junior or senior on at least a half-time basis in a technical . . . or a private [college] in Wisconsin eligible to participate in the grant program." WIS. ADMIN. CODE § HEA 12.02(3) (Nov. 2024). A student's "grant award shall not exceed $2,500 per academic year," and students are eligible for a grant for up to eight semesters. WIS. ADMIN. CODE § HEA 12.03(1)–(2) (Nov. 2024). Students who are not Black American, Hispanic, American Indian, Laotian, Cambodian, or Vietnamese are categorically ineligible for any grant under the Grant Program.

¶8    The Taxpayers object to their tax dollars being spent in a racially discriminatory manner. The Taxpayers sought a declaratory judgment that the Grant Program violates the Equal Protection Clause of the United States Constitution and Article I, Section 1 of the Wisconsin Constitution because students belonging to the preferred racial, national origin, ancestry, or alienage groups are eligible for the grants, while students of other racial, national origin, ancestry, or alienage groups are not. The parties filed cross-motions for summary judgment, addressing standing as well as the constitutionality of the Grant Program.

¶9    The Taxpayers contended that they have standing to challenge the unlawful expenditure of taxpayer money. They sought a declaration that the Grant Program is unconstitutional because it unlawfully discriminates against students based on race, national origin, ancestry, and alienage. They also sought an injunction.

¶10    HEAB responded that the Grant Program was a "lawful component of a larger admissions process: a process that may take race into account to promote diversity, which the United States Supreme Court has repeatedly confirmed is proper," and "should be rejected for more basic reasons: [the Taxpayers] do not have standing." HEAB maintained that the

---

(5) By November 1, 2001, and annually thereafter, the board shall report to the department of administration on the effectiveness of the program under this section.

WIS. STAT. § 39.44(4)–(5).

evidence showed that the Grant Program's "impacts can be achieved via no alternative means and are necessary as part of the lawful process of promoting diversity in higher education." In its view, "the Grant Program is narrowly tailored to serve a compelling interest in improving minority retention and graduation rates at Wisconsin higher educational institutions."

¶11    The circuit court determined that the Taxpayers have standing to challenge the Grant Program, but upheld it as constitutional under *Grutter v. Bollinger*, 539 U.S. 306 (2003), because HEAB "has a compelling interest in attaining in [sic] a diverse student body," and "[t]he Grant Program promotes the diversity of student bodies by helping minority students with financial need remain enrolled in school and graduate." The circuit court found that WIS. STAT. § 39.44 "was adopted and enacted to retain a diverse population of lawfully admitted students, who otherwise fail to remain in their programs at disproportionally high rates," and "[t]hat purpose, and the need for it, continues to this day." The circuit court also found that the Grant Program was narrowly tailored because "there are no race-neutral alternatives to the Grant Program that would be as effective as its current race-based criteria," and "[t]he small pool of funding would be severely diluted by a much larger pool of eligible applicants," which "would naturally reduce the Grant Program's effectiveness in achieving diversity through minority retention." The circuit court granted summary judgment to HEAB, denying the same to the Taxpayers. The Taxpayers appealed.

¶12    While the case was pending in the court of appeals, the United States Supreme Court issued *SFFA*, 600 U.S. 181. In *SFFA*, the Supreme Court struck down two universities' practice of using race-based classifications to make college-admission determinations, concluding that the practice violated the United States Constitution's Equal Protection Clause. In the Court's view, "the 'core purpose' of the Equal Protection Clause" is "do[ing] away with all governmentally imposed discrimination based on race." *SFFA*, 600 U.S. at 206 (alteration in original). Based on our nation's history, the Court explained that only "the most extraordinary case" could justify "[d]istinctions between citizens solely because of their ancestry" because such distinctions "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Id*. at 208. In the university context, "no State has any authority under the [clause] to use race as a factor in affording educational opportunities among its citizens." *Id*. at 204. To hold otherwise eviscerates the Equal Protection

Clause's requirement of "equality of treatment before the law for all persons without regard to race or color." *Id*. at 205.

¶13    Bound by the Court's ruling in *SFFA*, the court of appeals held that the Grant Program violated the Equal Protection Clause's core principles and struck down the Grant Program as unconstitutional. *Rabiebna*, 416 Wis. 2d 44, ¶87. Applying *SFFA*, the court of appeals held that diversity is no longer a compelling interest in higher education and concluded that the Grant Program is materially indistinguishable from the race-based admissions programs invalidated in *SFFA*. The court of appeals reversed the circuit court and enjoined HEAB from administering the program. *Id*.

¶14    Now, HEAB has appealed the court of appeals' ruling to this court. The issues before us are twofold: Whether the Taxpayers have standing to bring this action under Wisconsin's taxpayer-standing doctrine. If the Taxpayers have standing, then this court must determine whether the Grant Program—created by WIS. STAT. § 39.44 and administered by HEAB—violates the Equal Protection Clause.

¶15    We conclude that (1) the Taxpayers have standing, and (2) the Grant Program violates the Equal Protection Clause of the Fourteenth Amendment. Accordingly, we affirm the court of appeals and conclude that HEAB is enjoined from operating the Grant Program.

## II. STANDARD OF REVIEW

¶16    Before reaching the merits of HEAB's claim, we must first determine whether the Taxpayers have standing to challenge the Grant Program. Standing presents a question of law. We review this question de novo. *Silver Lake Sanitary Dist. v. DNR*, 2000 WI App 19, ¶6, 232 Wis. 2d 217, 607 N.W.2d 50 (Ct. App. 1999). If the Taxpayers have standing, then we must decide whether WIS. STAT. § 39.44 and the Grant Program violate the Equal Protection Clause of the Fourteenth Amendment. We also review this question of law de novo. *Madison Tchrs., Inc. v. Walker*, 2014 WI 99, ¶13, 358 Wis. 2d 1, 851 N.W.2d 337.

## III.  DISCUSSION

### A.  STANDING

¶17   HEAB argues that the Taxpayers lack standing for two reasons. First, the Taxpayers have not suffered a direct and personal pecuniary loss; and second, the relief that the Taxpayers seek will not result in a reduction in the government's spending. Because the Taxpayers have requested that the program could proceed without racial criteria for eligibility, HEAB argues, any relief granted will not reduce the Taxpayers' burden. Conversely, the Taxpayers alleged that they pay Wisconsin taxes, the Grant Program authorized by WIS. STAT. § 39.44 is unconstitutional, and HEAB expends state funds administering that program. Their argument is that the Grant Program unlawfully discriminates on the basis of race in violation of the Equal Protection Clause of the Constitution. In turn, any grants awarded constitute an illegal expenditure of government funds. To the Taxpayers, the amount of the loss to each individual taxpayer is irrelevant: Any illegal expenditure of funds causes the Taxpayers to sustain a pecuniary loss.

¶18   We hold that the Taxpayers have standing. In Wisconsin, taxpayers may challenge the illegal expenditures of public funds. *S.D. Realty Co. v. Sewerage Comm'n of City of Milwaukee*, 15 Wis. 2d 15, 21–23, 112 N.W.2d 177 (1961). In taxpayer actions, the complaining taxpayers must allege that the "taxpayers as a class have sustained, or will sustain, some pecuniary loss." *Id.* at 21. Because "a taxpayer [has] a financial interest in public funds . . . akin to that of a stockholder in a private corporation," "[a]ny illegal expenditure of public funds directly affects taxpayers and causes them to sustain a pecuniary loss." *Id*. at 22. "This is because it results either in the governmental unit having less money to spend for legitimate governmental objectives, or in the levy of additional taxes to make up for the loss resulting from the expenditure." *Id*. The fact that the loss to any one, individual taxpayer may be minimal does not defeat standing. *Wagner v. City of Milwaukee*, 196 Wis. 328, 330–31, 220 N.W. 207 (1928).

¶19   Here, the Taxpayers—who allege that the Grant Program violates the Equal Protection Clause by distributing Taxpayer funds to racially preferred groups—have alleged a pecuniary loss. And, the Taxpayers do not need to show that a favorable decision would decrease their overall tax burden. The misallocation of the previous costs suffices. *Fabick v. Evers*, 2021 WI 28, ¶11, 396 Wis. 2d 231, 956 N.W.2d 856.

¶20    Because the Taxpayers allege that public funds are being expended pursuant to an unconstitutional statute, we conclude that the Taxpayers have standing to challenge the Grant Program. We now turn to the merits of the parties' arguments.

## B.  THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

¶21    The weightier question before this court is whether the Grant Program violates the Equal Protection Clause of the Fourteenth Amendment.

¶22    The Fourteenth Amendment provides that:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST., AMEND. XIV § 1.

¶23    At the heart of the Equal Protection Clause is the principle that race-, national origin-, ancestry-, or alienage-based discrimination is unconstitutional except in the most extraordinary instances where such a remedy is required. That requires all individuals to be treated equally without regard to one's race, ancestry, origin, or ethnicity. *See Palmore v. Sidoti*, 466 U.S. 429, 432 (1984) (declaring the Equal Protection Clause's core purpose: "do[ing] away with all governmentally imposed discrimination based on race") (footnote omitted). Under the Equal Protection Clause, the government must treat each citizen as an individual—not as one member of a class. *Miller v. Johnson*, 515 U.S. 900, 911 (1995). The Constitution requires that every person "must be treated based on his or her experiences as an individual—not on the basis of race." *SFFA*, 600 U.S. at 231. Consequently, "no State has any authority under the equal-protection clause of the Fourteenth Amendment to use race as a factor in affording educational opportunities among its citizens." *Id.* at 204 (citation omitted).

## C.  STRICT SCRUTINY IN RACE-BASED ADMISSIONS CASES

¶24    Because racial classifications are "odious" to the Constitution, *Rice v. Cayetano*, 528 U.S. 495, 517 (2000) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)), statutes concerning one's race are inherently

invidious, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991), regardless of how benign or laudable the law may appear, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion).

¶25     Statutes discriminating upon race, thus, require the government to satisfy strict scrutiny's two-step analysis. *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995); *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 291 (1978) (opinion of Powell, J., joined by White, J.) ("Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination."). First, the racial classification must be used to "further compelling governmental interests." *Grutter*, 539 U.S. at 326. Second, it must be "narrowly tailored," i.e., "necessary," to achieve that interest. *Fisher v. Univ. of Tex. at Aus.*, 570 U.S. 297, 311–12 (2013). If the statute fails at either step, then the statute fails strict scrutiny.

¶26     The Supreme Court first considered a university's race-based classifications in *Regents of University of California v. Bakke*. There, a medical school reserved 16 of its 100 seats for members of certain minority groups who were reviewed on a special admission track separate from those in the main admissions pool. *Bakke,* 438 U.S. at 272–75. The medical school's quota precluded the entrance of applicants from certain races despite those students' superior academic credentials. *Id.* at 276–77. In a fractured opinion, Justice Powell concluded that the school's interest in obtaining the educational benefits that flow from a racially diverse student body was "a constitutionally permissible goal for an institution of higher education." *Id.* at 311–12. In Justice Powell's view, institutions of higher education have a First Amendment right to "to make [their] own judgments as to . . . the selection of [their] student body." *Id.* at 312. However, the school's quota system was ultimately struck down. By failing to consider each applicant individually, the Court held that the program was not narrowly tailored to achieve the state's interest, which "is not an interest in simple ethnic diversity," but instead "encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element." *Id.* at 315.

¶27     The Supreme Court revisited race-based admissions 25 years later when it issued *Grutter v. Bollinger*, 539 U.S. 306, and *Gratz v. Bollinger*, 539 U.S. 244 (2003), contemporaneously. In *Grutter*, a law school sought to "admit a group of students who individually and collectively are among the most capable," with "a strong likelihood of succeeding in the practice of law and contributing in diverse ways to the well-being of others" by

enrolling "a mix of students with varying backgrounds and experiences who will respect and learn from each other." *Grutter*, 539 U.S. at 312–14. Admissions decisions considered a myriad of possible bases for diversity, including race and ethnicity. *Id*. at 314–16.

¶28   Upholding the admissions policy, the Court supported "Justice Powell's view that student body diversity is a compelling state interest that can justify the use of race in university admissions." *Id*. at 325, 343. To that end, the law school's interest in obtaining the pedagogical benefits that flow from a diverse student body was compelling. *Id.* at 328.

¶29   The policy was also narrowly tailored. Unlike the quota program used by the medical school in *Bakke*, 438 U.S. 265, the law school's program did not "insulat[e] each category of applicants with certain desired qualifications from competition with all other applicants." 539 U.S. at 334 (alteration in original) (quoting *Bakke*, 438 U.S. at 315 (opinion of Powell, J.)). In *Grutter*, the school considered a host of factors, including race, to determine a student's diversity. *Id*. at 337-39.

¶30   The admissions program in *Gratz*, however, was struck down. *Gratz* considered an undergraduate admissions policy whereby the university used a selection index to score applicants up to a maximum of 150 points. *Gratz*, 539 U.S. at 255. Applicants received points based on their high school grade point average, standardized test scores, high school's academic quality, strength or weakness of high school curriculum, in-state residency, alumni relationship, personal essay, personal achievement or leadership, and automatically received 20 points based upon their membership in an underrepresented racial or ethnic minority group. *Id*. In light of the decision rendered on the same day in *Grutter*, the Court upheld the university's compelling interest of "the educational benefits that result from having a diverse student body." *Id*. at 267. But the Court found that the program was not narrowly tailored to achieve its interest. *Id*. at 270. By "automatically distribut[ing] 20 points" "to every single 'underrepresented minority' applicant solely because of race," the school was not "considering each particular applicant as an individual, assessing all of the qualities that individual possesses, and in turn, evaluating that individual's ability to contribute to the unique setting of higher education." *Id*. at 270–71 (citing *Bakke*, 438 U.S. at 315 (opinion of Powell, J.)). Instead, the policy "contemplate[d] that any single characteristic automatically ensured a specific and identifiable contribution to a university's diversity." *Id*. at 271 (citation modified). Whereas the school in *Grutter* considered the various diversity qualifications of each applicant, including race, on a case-by-case

basis, the undergraduate institution's "automatic distribution of 20 points has the effect of making 'the factor of race . . . decisive.'" *Id*. at 272 (alteration in original) (quoting *Bakke*, 438 U.S. at 317 (opinion of Powell, J.)).

¶31　Most recently, the Supreme Court considered the constitutionality of race-based admissions programs in *SFFA*. There, the Court considered whether admissions decisions that turn on a student's race violated the Equal Protection Clause. 600 U.S. at 197–98. The Court considered two different universities: Harvard College and the University of North Carolina ("UNC"). Harvard considered each applicant's race to ensure that it maintained its annual level of minority admissions. *Id*. at 194. "Race [wa]s a determinative tip for" all of the school's minority students, making it more likely for minority students to be admitted compared to nonminority applicants. *Id*. at 195 (citation modified).

¶32　At UNC, the individuals who initially reviewed a prospective student's application considered race in their initial review. *Id*. at 195. Race acted as a "plus" in each student's application. *Id*. at 196 (citation omitted). If the initial reader recommended admitting the student, then the final committee could "consider the applicant's race" before offering the applicant a spot at the university. *Id*. at 196–97.

¶33　The Court reviewed the history of the Equal Protection Clause, and its application to race-based admissions programs, and explained that "the right to a public education 'must be made available to all on equal terms.'" *Id*. at 204 (quoting *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954)). That means that an individual's race cannot be used to "to foreclose an individual 'from all consideration.'" *Id*. at 209 (quoting *Bakke*, 438 U.S. at 318 (opinion of Powell, J.)).

¶34　In the context of "race-based admissions," the Court concluded that a university's race-based admissions schemes "must comply with strict scrutiny, they may never use race as a stereotype or negative, and—at some point—they must end." 600 U.S. at 213. The colleges' admissions programs failed in all three respects.

¶35　With these principles in mind, we now turn to Wis. Stat. § 39.44 and the Grant Program.

## IV.  APPLICATION

### A.  The Government Has Not Demonstrated Its Compelling Interest.

¶36    Wisconsin Stat. § 39.44 treats members of specific race-, national origin-, ancestry-, or alienage-based groups differently. The statute discriminates against students of nonpreferred classes by precluding them from eligibility for taxpayer-funded financial aid under the Grant Program. Because the Grant Program discriminates on the bases of race, national origin, ancestry, and alienage, we analyze the statute's constitutionality under strict scrutiny's two-step rubric. At step one, the legislature must identify the ends it is seeking to achieve. *See Wersal v. Sexton*, 674 F.3d 1010, 1020 (8th Cir. 2012) (en banc) (describing strict scrutiny as an ends-and-means test); *Republican Party of Minn. v. White*, 416 F.3d 738, 750 (8th Cir. 2005) (en banc) (defining the compelling interest as "the end"). Whether by previous government-sanctioned discrimination, regulatory discrimination, or legislatively demonstrated statistical findings, the government must articulate its objective in enacting the race-based regime. Because "[r]acial discrimination[] [is] invidious in all contexts," *Edmonson*, 500 U.S. at 619, race-based educational programs must be "sufficiently measurable to permit judicial [review]" under the rubric of strict scrutiny, *Fisher v. Univ. of Tex. at Aus. (Fisher II)*, 579 U.S. 365, 381 (2016).

¶37    Recognizing deference due, *Bakke* and *Grutter* upheld "diversity" as a compelling interest, in part because courts traditionally give "a degree of deference to a university's academic decisions." *Grutter*, 539 U.S. at 328.

¶38    Courts have concluded that a variety of interests are "compelling." *See, e.g., Franks v. Bowman Transp. Co.*, 424 U.S. 747, 779–80 (1976) (approving retroactive award of seniority to class of truckdrivers who had been victims of unlawful employment discrimination); *Johnson v. California*, 543 U.S. 499, 507, 512–13 (2005) (assigning inmates based upon their race to prevent violence caused by racial gangs in prison); *Korematsu v. United States*, 323 U.S. 214, 216–17 (1944) (preventing espionage and sabotage during war).

¶39    The government's interest must not be "amorphous." *See SFFA*, 600 U.S. at 226 (remedying social discrimination is "an amorphous concept of injury that may be ageless in its reach into the past") (quoting *Bakke*, 438 U.S. at 307 (opinion of Powell, J.)). *But see Franks*, 424 U.S. at 771

(paying backpay makes members of the discriminated class "whole for [the] injuries [they] suffered"); *Johnson v. California*, 543 U.S. at 507 (injuries); *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977) (comparing the distribution of students "to what it would have been in the absence of such constitutional violations"). It must be empirically adduced.

¶40 Over time, courts have rejected many of these asserted race-based interests. *See Trump v. Hawaii*, 585 U.S. 667, 710 (2018) (declaring that *Korematsu* was "gravely wrong the day it was decided"); *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996) ("[A]n effort to alleviate the effects of societal discrimination is not a compelling interest."); *J.A. Croson Co.*, 488 U.S. at 505–06 (permitting "past societal discrimination" to "serve as the basis for rigid racial preferences" would shutter "[t]he dream of a Nation of equal citizens" "in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs" "contrary to both the letter and spirit" of the Constitution "whose central command is equality").

¶41 Currently, the Court's precedents have recognized two compelling interests justifying the governmental use of racial classifications: Avoiding race riots in prison, *Johnson*, 543 U.S. at 512–13, and remediating specific, identified instances of government-sanctioned discrimination, *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007); *Hunt*, 517 U.S. at 909–10. Neither are relevant here.

¶42 We hold that HEAB has failed to demonstrate that the legislature's goals of increasing diversity and equalizing educational opportunities for certain students are compelling in this instance. In the circuit court, HEAB argued that "the reason for the Grant Program, from its genesis, is to retain a diverse population of lawfully admitted students, who otherwise fail to remain in their programs at disproportionally high rates." In HEAB's view, "[t]he Grant Program serves the compelling interest of promoting the diversity of student bodies by helping minority students with financial need remain enrolled in school and graduate." Under *Grutter v. Bollinger*, HEAB posited that the first "prong of strict scrutiny is met, as the [United States] Supreme Court has repeatedly held diversity in higher education is a compelling interest. *Grutter*, 539 U.S. at 328; *Fisher*, 570 U.S. at 309."

¶43 HEAB reiterated its position at the court of appeals. Once again, HEAB asserted that the Wisconsin Legislature enacted WIS. STAT. § 39.44, which established the Grant Program, to remedy a "crisis in education" by financially assisting certain racially classified groups to

retain their attendance in private and technical colleges so as to foster "student body diversity" on those campuses and not "rob[] the schools of the enriching environment a diverse student body brings." The Grant Program "solve[s] the problem of schools losing their diverse student bodies through financial attrition, which is the same compelling end at issue in *Grutter*[, 539 U.S. 306]: attaining student body diversity." To HEAB, the Grant Program's compelling interest was increasing student diversity.

¶44    But HEAB modified its stance after *SFFA*. Despite its previous assertions, HEAB contended that the legislature enacted WIS. STAT. § 39.44 to increase the retention and graduation rates of certain racial groups of students to mitigate the disparity between the graduation rates for Black-American, Hispanic, and American-Indian students and students from nonpreferred classes in Wisconsin's private and technical colleges. Post-*SFFA*, HEAB's position was that the Grant Program remedied a "crisis" in retention and graduation rates among certain preferred minorities.

¶45    Now, before this court, HEAB insists that the "statute reflects the State's compelling interest in reducing disproportionate [attrition]" "rates among Black, Hispanic, American Indian, and certain Southeast Asian students by awarding grants, beginning sophomore year, through the Wisconsin technical colleges, private colleges, and tribal colleges the students attend." By reducing the disproportionate attrition rates, the Grant Program "furthers the compelling interests of diversity and equal educational opportunity."

¶46    Here, HEAB's first asserted interest—promoting the diversity of student bodies by helping minority students with financial needs remain enrolled in school and graduate—fails. At WIS. STAT. § 39.44's inception, the legislature sought to promote diversity in higher education by retaining a diverse population who fail to remain in the state's higher educational programs at disproportionally high rates. Certainly, objectives rooted in diversity might seem compelling. *See, e.g., Bakke*, 438 U.S. 265; *Grutter*, 539 U.S. 306; *Fisher II*, 579 U.S. 365. But the *SFFA* Court concluded that the objectives identified by the universities as flowing from a diverse student body were "not sufficiently coherent" to constitute a compelling government interest. *SFFA*, 600 U.S. at 214. Here, HEAB has not even identified any objectives or benefits it hopes to promote or achieve through diverse student bodies at private and technical colleges. Thus, it is left to argue that diversity is a compelling interest in and of itself, a position that lacks support under current law.

¶47     And, HEAB has failed to demonstrate how its second asserted interest—equalizing education opportunities for certain students by offering them financial aid—was compelling when WIS. STAT. § 39.44 was enacted. Ensuring that all public educational opportunities are offered to all students is vital to a free and fair nation. The schoolhouse doors should be open to all. But before the government may impose a race-, national origin-, ancestry-, or alienage-based remedy, it must demonstrate through previous government-sanctioned discrimination, regulatory discrimination, legislatively demonstrated statistical findings, or otherwise that the problem it seeks to remedy actually existed when the statute was passed. *See, e.g.*, *J.A. Croson Co.*, 488 U.S. at 500 (requiring legislatures to provide a strong evidentiary basis before concluding that race-based remedial action is required); *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000) (making this showing requires a state to rely on more than "mere speculation, or legislative pronouncements, of past discrimination"). None of HEAB's data is from the time of the statute's enactment. Its support stems from data produced decades later. HEAB's data shows that between 2015 and 2016, 80% of students who received financial aid from the Grant Program either completed or were continuing toward completing their degree or certificate. Similarly, recipients' graduation or retention rates were 85% in 2016 to 2017, 77% in 2017 to 2018, and 80% in 2018 to 2019. For Wisconsin technical colleges, HEAB asserts that "grant recipients graduated at more than double the rate of students who did not receive a grant, 69% to 29%." Between 2019 and 2020, "85% of grant recipients reported that, without it, they either would not have been able to attend school, or would have faced difficulties in doing so."

¶48     Yet, as the court of appeals correctly noted, the data that the legislature relied upon when promulgating the statute focused on the University of Wisconsin's four-year, public universities—not technical and private colleges across the state. *Rabiebna*, 416 Wis. 2d 44, ¶¶46–48. Moreover, the legislature's research in the 1980s addressed the governor's proposal, which focused specifically on the University of Wisconsin. *Id.*, ¶46. No evaluation of minority students in private schools was made at that time. *Id.* Thus, the legislature did not identify a retention disparity in private or technical colleges for students in the preferred racial, national origin, ancestral, and alienage groups justifying the government's asserted interest in offering grants to particular classes of students to equalize their educational opportunities.

¶49      As the court of appeals correctly recognized, the record does not reflect that Wisconsin's technical or private colleges needed the legislature to enact a race-, national origin-, ancestry-, or alienage-based remedy in the 1980s. *Id.,* ¶49. Without evidence to the contrary, we cannot assume that the legislature enacted WIS. STAT. § 39.44 to address an unidentified retention and graduation problem at private and technical colleges. The fact that the legislature biennially reviews and funds the Grant Program does not remedy the statute's original deficiency. Our compelling interest analysis focuses on the record before the legislature when the statute was passed. *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.,* 345 F.3d 964, 971 (8th Cir. 2003); *see also Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 277 (1986) (plurality opinion) (analyzing asserted compelling interests "before [a schoolboard] embarks on an affirmative-action program" to ensure "it has convincing evidence that remedial action is warranted"). HEAB's new, post-hoc justification of the legislature's initial purpose cannot save it now. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16 (1975) ("This Court need not in equal protection cases accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose could not have been a goal of the legislation."). Simply put, HEAB has not shown that the legislature identified an issue requiring its intervention at the statute's inception.

¶50      Bolstering this conclusion is the dearth of case law supporting HEAB's contention that its goals are compelling. Indeed, HEAB conceded at oral argument that it is hoping that this court will be the first to recognize its asserted interest in equalizing educational opportunities by offering financial aid to some but not all students to retain preferred classes of students. No other court has held that these interests are compelling, and on this record, this court declines to be the first.

¶51      Even if HEAB's goals might be viewed as commendable, we conclude that HEAB has not demonstrated that the legislature had a compelling interest in instituting its race-based financial aid program.

### B.  NOR ARE THE MEANS CHOSEN NARROWLY TAILORED TO ACHIEVE HEAB'S ENDS.

¶52      Regardless of whether a compelling interest might exist, the Grant Program still fails because the statute is not narrowly tailored. Strict scrutiny's second step requires the court to analyze whether the means chosen are narrowly tailored to achieve the legislature's ends. *J.A. Croson*

*Co.*, 488 U.S. at 493 (plurality opinion). Those "means . . . must be specifically and narrowly framed to accomplish that purpose." *Hunt*, 517 U.S. at 908 (quoting *Wygant*, 476 U.S. at 280 (plurality opinion)); *see also J.A. Croson Co.*, 488 U.S. at 493 (plurality opinion) (narrow tailoring ensures "the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype").

¶53    The court does not need to conjure up possibilities that may achieve similar goals, but instead, the government must demonstrate that race-neutral alternatives cannot accomplish the same ends. *Grutter*, 539 U.S. at 339–40. Nor can the race-conscious program use a quota system, *Bakke*, 438 U.S. at 315 (opinion of Powell, J.), or "insulat[e] each category of applicants with certain desired qualifications from competition with all other applicants," *Grutter*, 539 U.S. at 334 (alteration in original) (quoting *Bakke*, 438 U.S. at 315 (opinion of Powell, J.)). At this step, the government's chosen means are not granted any deference. *Fisher*, 570 U.S. at 311.

¶54    According to HEAB, the Grant Program is narrowly tailored because "[i]t identifies specific groups with college attrition rates far above those of White and Asian students and creates very small, need-based scholarships to address that problem." It provides statistics and experts' opinions in support of its position that "a mere focus on socioeconomic status and using need as a basis would not provide the results that the schools currently obtain through the use of the [Grant] Program." But HEAB's argument fails to meet a narrow tailoring analysis, as it failed to "consider[] workable race-neutral alternatives." *Grutter*, 539 U.S. at 340.

¶55    And HEAB's Grant Program is not narrowly tailored to achieve either of HEAB's asserted interests.[3] When the government is seeking to further a diversity interest in the higher-education context, the government may not use race as a dispositive factor. Instead, the government's program may use race as one factor of many, but must "remain flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the

---

[3] The asserted compelling interests are promoting the diversity of student bodies by helping minority students with financial needs remain enrolled in school and graduate and equalizing education opportunities for certain students by offering them financial aid.

defining feature of his or her application." *Id*. at 337. Because the Grant Program's statute uses race as the dispositive factor for either of HEAB's asserted interests, neither survives.

¶56 Under the Grant Program, race is not but one factor in a "highly individualized, holistic review"; race is the only factor. *Id.* Either a student is, or is not, a member of the preferred racial group. Whether such financial benefits to an asserted interest in diversity or an equalization of education opportunities, making race the dispositive factor—and not one factor in a holistic review of each individual student—is fatal to HEAB's case. *See Gratz*, 539 U.S. at 274–75 (determining a university's admissions program violated the Equal Protection Clause because it utilized race as "a decisive factor for virtually every minimally qualified underrepresented minority applicant"); *Fisher*, 570 U.S. at 312 (requiring that each applicant be viewed holistically—"not in a way that makes an applicant's race or ethnicity the defining feature of his or her application" (quoting *Grutter*, 539 U.S. at 337)). The importance of this individualized consideration in the context of a race-conscious higher education program is paramount. *See Bakke*, 438 U.S. at 318 n.52 (opinion of Powell, J.) (identifying the "denial . . . of th[e] right to individualized consideration" as the "principal evil" of the medical school's admissions program).

¶57 Truly individualized consideration demands that race be used in a flexible, nonmechanical way. *Grutter*, 539 U.S. at 334. While the role that race has played in an applicant's life may operate as one factor in considering an applicant for admission, even those decisions must be "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant." *Bakke*, 438 U.S. at 317 (opinion of Powell, J.). Just like the plan struck down in *Gratz*, the plan here "do[es] not provide for a meaningful individualized review of applicants," but instead relies on racial classifications in a "nonindividualized, mechanical" way. *Gratz* 539 U.S. at 276, 280 (O'Connor, J. concurring). That is not permitted. *See SFFA*, 600 U.S. at 231 ("[T]he student must be treated based on his or her experiences as an individual—not on the basis of race.").

¶58 Consequently, with race being the sole decisive factor, HEAB does not conduct a highly individualized, holistic review of each student employing race as one "'factor of a factor of a factor' in the holistic-review calculus." *Fisher II*, 579 U.S. at 375 (citation omitted). Because HEAB has not satisfied both prongs of strict scrutiny, we need not go further to address the other considerations in *SFFA*.

## V.  CONCLUSION

¶59    The Taxpayers filed a declaratory action with the Jefferson County circuit court seeking to enjoin HEAB from administering the Grant Program. The Taxpayers argued that the Grant Program violates the Equal Protection Clause of the Fourteenth Amendment by impermissibly limiting eligibility to students who belong to specified racial-, national origin-, ancestry-, or alienage-based groups. The circuit court upheld the statute, concluding that under *Grutter*, 539 U.S. 306, and its progeny, fostering diversity in higher education is a compelling state interest, and the Grant Program is narrowly tailored because it provides modest, need-based aid to students from groups with disproportionately high attrition rates. The Taxpayers appealed.

¶60    While the appeal was pending, the United States Supreme Court issued its decision in *SFFA*, 600 U.S. 181. Applying *SFFA*, the court of appeals reversed the circuit court, holding that attaining diversity in higher education is no longer a compelling interest, and that the Grant Program was not narrowly tailored to fulfill those ends. The court of appeals remanded to the circuit court with directions to enjoin HEAB from administering the Grant Program. HEAB appealed asserting that the Grant Program's compelling interest is in remedying a crisis in the attrition rates of specifically identified racial groups and the descendants of particular nations in Wisconsin's private and technical colleges. Regardless, HEAB argued that the Taxpayers lack standing to challenge the Grant Program since they have not demonstrated a particularized, pecuniary injury associated with the Grant Program's administration.

¶61    We conclude that the Taxpayers have standing and that the Grant Program violates the Equal Protection Clause of the Fourteenth Amendment. Accordingly, we affirm the court of appeals' decision that the statute is unconstitutional and conclude that HEAB is enjoined from operating the Grant Program.

*By the Court.*—The decision of the court of appeals is affirmed.

JILL J. KAROFSKY, C.J., with whom SUSAN M. CRAWFORD, J., joins, concurring.

¶62     In the wake of the Civil War, the Thirteenth, Fourteenth, and Fifteenth Amendments were ratified as part of the Reconstruction effort. The Fourteenth Amendment granted citizenship to formerly enslaved people, ensured the due process of law, and applied equal protection of the law to state governments. U.S. CONST. amend. XIV, § 1 ("[N]or shall any state . . . deny to any person within its jurisdiction the equal protection of the laws."). The Fourteenth Amendment embodies the aspirations of a country seeking to heal after being torn apart by the evils of slavery and the Civil War. Rather than turn a blind-eye to the scourge of racism and slavery, the Fourteenth Amendment's Equal Protection Clause faces it head-on by demanding change and requiring equal protection of the laws for all people. Inherent in its language is a recognition of the wrongs of prejudice, discrimination, and injustice. The Fourteenth Amendment represents a nation striving to be a more perfect union.

¶63     From the time it was ratified, forces worked to undermine the Fourteenth Amendment, and those forces succeeded in creating a racist retrenchment[1] that has continued to the present.[2] Today, 150 years after its

---

[1] *See, e.g.*, *United States v. Cruikshank*, 92 U.S. 542, 554, 559 (1875) (reversing the convictions of White defendants who participated in the 1873 Colfax Massacre, holding that the Equal Protection Clause "does not . . . add anything to the rights which one citizen has under the Constitution against another"); *Civil Rights Cases*, 109 U.S. 3, 25 (1883) (Civil Rights Act of 1875 was unconstitutional because it was not supported by either the Thirteenth or Fourteenth Amendments); *Plessy v. Ferguson*, 163 U.S. 537, 544 (1896), *overruled by Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483 (1954) (Louisiana law requiring separate but equal facilities for Black and White passengers did not violate the Fourteenth Amendment because the Fourteenth Amendment "could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either.").

[2] *See, e.g.*, *Korematsu v. United States*, 323 U.S. 214 (1944) (upholding Japanese internment camps during World War II); *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 50–54 (1959) (upholding North Carolina's literacy test against a challenge under the Fourteenth and Seventeenth Amendments); *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (upholding California's exclusion of

ratification, some of our highest institutions continue to disregard the foundational promise of equality and continue to pull our nation backwards.[3]

¶64     Why have we not learned from our past? Why are we not willing to recognize the harms this country has caused to those who are marginalized, disempowered, or disenfranchised? Why, instead of wielding the Equal Protection Clause as a sword against racism, do we employ it to shield against the promise of equality for all? The answer appears to be because we have failed to fully recognize how societal and governmental practices have long continued to enforce a preference for White Americans and to burden Black Americans and those of other disadvantaged races or backgrounds.

¶65     A recent example of that failed recognition is *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023) (hereinafter *SFFA*). In *SFFA* the U.S. Supreme Court ruled that race-based affirmative action programs in college admissions violated the Equal Protection Clause. The Court reasoned that under the Equal Protection Clause all government action must be color blind because "[e]liminating racial discrimination means eliminating all of it." *Id.* at 206. The Court explained that, "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Id. (quoting Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289–290 (1978) (opinion of Powell, J.)). In concluding, the Court observed that universities have for too long "concluded, wrongly, that the

---

ex-felons from the franchise against a challenge under the Equal Protection Clause); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 511 (1989) (because Richmond did not identify a need for remedial action in the awarding of its public construction contracts, its Minority Business Utilization Plan violated the Equal Protection Clause).

[3] *See, e.g., Shelby Cnty., Alabama v. Holder*, 570 U.S. 529 (2013) (constructively striking down section 5 of the Voting Rights Act as unconstitutional); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 230 (2023) (striking down the undergraduate admission programs at Harvard College and the University of North Carolina at Chapel Hill as violating the Equal Protection Clause); *Louisiana v. Callais*, 608 U.S. -- , 146 S. Ct. 1131 (2026) (gutting section 2 of the Voting Rights Act).

touchstone of an individual's identity is not challenges bested, skills built, or lessons learned but the color of their skin. Our constitutional history does not tolerate that choice." *Id.* at 231. In short, the Court ruled that *it is racist to remedy racism.*

¶66    The dissenters handily exposed the fault lines in the majority's opinion. They described how the Fourteenth Amendment was enacted to combat a history of racism, was *never* color blind, and should not be applied in a color-blind manner today. *See SFFA*, 600 U.S. at 318–84 (Sotomayor, J., dissenting), 384–411 (Jackson, J., dissenting). Justice Sonia Sotomayor effectively dispatched with the majority's incorrect conclusion that racial inequity is no longer a problem in this country. *SFFA*, 600 U.S. at 334–41. She demonstrated how the Fourteenth Amendment protects an educational institution's right to consider race to advance racial diversity in higher education. *Id.*

¶67    And Justice Ketanji Brown Jackson took to task the majority's incorrect assumption that race blindness will advance rather than hinder this country's efforts towards equality. *Id.* at 403–09. Those writings are brilliant, and the salient points are worthy of their own read. In this writing, I focus on the following passage from Justice Jackson's dissent:

> With let-them-eat-cake obliviousness, today, the majority pulls the ripcord and announces "colorblindness for all" by legal fiat. But deeming race irrelevant in law does not make it so in life. And having so detached itself from this country's actual past and present experiences, the Court has now been lured into interfering with the crucial work that UNC and other institutions of higher learning are doing to solve America's real-world problems.

> No one benefits from ignorance. Although formal race-linked legal barriers are gone, race still matters to the lived experiences of all Americans in innumerable ways, and today's ruling makes things worse, not better. The best that can be said of the majority's perspective is that it proceeds (ostrich-like) from the hope that preventing consideration of race will end racism. But if that is its motivation, the majority proceeds in vain. If the colleges of this country are required to ignore a thing that matters, it will not just go away. It will take *longer* for racism to leave us. And, ultimately, ignoring race just makes it matter more.

The only way out of this morass—for all of us—is to stare at racial disparity unblinkingly, and then do what evidence and experts tell us is required to level the playing field and march forward together, collectively striving to achieve true equality for all Americans. It is no small irony that the judgment the majority hands down today will forestall the end of race-based disparities in this country, making the colorblind world the majority wistfully touts much more difficult to accomplish.

*Id.* at 407–08.

¶68 I fully recognize and acknowledge that I am bound by the precedent set forth in *SFFA* and other cases decided by the U.S. Supreme Court when interpreting the Fourteenth Amendment. As such, I concur in the mandate of the majority of this court. Under *SFFA*, § 39.44 cannot survive strict scrutiny. However, I also choose to write separately. I do so because I find it impossible to ignore the truths that Justice Jackson identifies. Those truths apply to real people here in Wisconsin.

¶69 I have previously written about the catastrophic impact of racial disparities in Wisconsin with respect to access to the political process, education, housing, employment, criminal justice, and health care. *Johnson v. WEC*, 2022 WI 19, ¶¶165–66, 401 Wis. 2d 198, 972 N.W.2d 559 (Karofsky, J., dissenting) ("From the outset, the crux of this redistricting controversy has been the long history of racial discrimination in and around Milwaukee that perpetuates the current racial disparities affecting Milwaukee's minority communities[.]" And "[s]hamefully, Wisconsin routinely ranks as one of the most racially disparate states in terms of housing, incarceration, education, income, and even infant mortality rates between Black and White residents. Those disparities result, in part, from Milwaukee's egregious history of race-based housing discrimination."); *Kaul v. Urmanski*, 2025 WI 32, ¶52, 417 Wis. 2d 257, 22 N.W.3d 740 (Karofsky, J., concurring) ("Black women in this state are one-and-a-half times more likely to face serious pregnancy complications compared to other groups, and Native American women follow close behind, with the second highest rate of maternal mortality in Wisconsin.").

¶70 Today, inspired by Justice Jackson's perspective, I focus on the historical and persistent reality that educational opportunities in Wisconsin have not been and are not currently equal. As such, I believe a

program like § 39.44 could be constitutional under an interpretation of the Fourteenth Amendment that honors its purpose—to combat oppression.

## I. INEQUALITY IN WISCONSIN EDUCATION

¶71  Today, education is perhaps the most important function of state and local governments. . . . It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. *Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.*

*Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493 (1954) (emphasis added).

¶72  America's history of racial segregation as it relates to education is well-known. Thirty years after the ratification of the Fourteenth Amendment, the Supreme Court declared in *Plessy v. Ferguson*, 163 U.S. 537 (1896), that the governmental policy of "separate but equal" was constitutional. The "Court's view of the Fourteenth Amendment reached its nadir in *Plessy*[.]" *SFFA*, 600 U.S. at 246 (Thomas, J., concurring). Indeed, *Plessy* turned equal protection on its head, led to Jim Crow laws, and sanctioned segregation and systemic inequality in education. *Id.* at 326–27 (Sotomayor, J., dissenting); *see also Bakke*, 438 U.S. at 393–94 (opinion of Marshall, J.). The unequal and segregated educational system remained for almost 60 years. Then in 1954 the U.S. Supreme Court reversed course and ruled in *Brown v. Board of Education of Topeka*, that racial segregation violated the Equal Protection Clause because separate but equal opportunities are inherently unequal. 347 U.S. 483. While *Brown* moved the needle in the right direction, it still took decades, further decisions by the Supreme Court, an act of Congress, and federal enforcement before school desegregation began in earnest. *See Brown v. Bd. of Educ. of Topeka*, 349 U.S. 294 (1955); The Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241; *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1 (1971).

¶73  Wisconsin has been part of this historical arc. Every Wisconsinite up to the age of 20 years old has the constitutional guarantee of equal educational opportunity. WIS. CONST. ART. X, § 3; *Vincent v. Voight*, 2000 WI 93, 236 Wis. 2d 588, 614 N.W.2d 388. Wisconsin's commitment to

ongoing education is evidenced by a vocational education program which the state pioneered back in 1911. *See Vill. of W. Milwaukee v. Area Bd. of Vocational, Technical and Adult Ed. (Dist. 9)*, 51 Wis. 2d 356, 360, 187 N.W.2d 387 (1971). That program established a network of vocational schools with night programs and apprenticeships for high school-aged and adult students. These programs were offered tuition-free until the 1960s when the program began to develop into the modern technical college system.

¶74 Despite this longstanding commitment to education, Wisconsin still grapples with segregated and unequal educational opportunities. In recent decades, schools have become more segregated, not less. The Milwaukee Public School System (MPS) consists of over 90% minority students. *Johnson*, 401 Wis. 2d 198, ¶168.[4] Minority students in Milwaukee are as likely to attend a highly segregated school now as they were in 1965. *Id.*

¶75 Segregation is undoubtedly a factor in unequal access to educational opportunities. According to the National Assessment of Educational Progress, although Wisconsin students overall are performing better than average, MPS students are well below average when compared to other metropolitan areas across the country.[5] As a whole, Wisconsin has the largest math and reading achievement gaps between White and Black students in the entire country. Recent studies have shown that Black, Hispanic, and Native American students throughout Wisconsin are more likely to be referred for disciplinary action and are more likely to receive a

---

[4] *See also Who Are the Students of MPS?*, MPS LRFMP: PEOPLE, https://www.mpsfacilitiesplan.com/people (last visited June 5, 2026).

[5] Corinne Hess, *Wisconsin Again Has Widest Gap in US for Math, Reading Scores Between White and Black Students*, WPR: EDUC., NEWS (Jan. 29, 2025), https://www.wpr.org/news/wisconsin-widest-gap-math-reading-white-black-students#:~:text=Education%2C%20News-,Wisconsin%20again%20has%20widest%20gap%20in%20US%20for%20math%2C%20reading,between%20white%20and%20Black%20students&text=Wisconsin%20continues%20to%20see%20the,at%20the%20state's%20average%20scores.

disciplinary removal than White students for similar behavior.[6] Unsurprisingly, disciplinary removals have been shown to negatively affect future academic engagement.[7] Black students continue to graduate from high school at a significantly lower rate than White students. Hispanic and Native American students also see significant achievement gaps.

¶76 Educational disparities in Wisconsin are not limited to grades K through 12 and have continued after high school. Petitioners point to documented racial disparities for college-aged students. In the 1980s, Wisconsin documented significant disparities in both enrollment and retention rates between minority students (particularly Black, Hispanic, and Native American students) and White students at four-year public colleges. These problems combined meant that in 1983, degrees conferred upon minority students represented only 2.4% of all degrees awarded. Today, significant retention problems still exist for Black, Hispanic, and Native American students. At two-year institutions, about half of all Asian and White students complete a degree within six years, as compared to only about a quarter of Black students and a third of Hispanic students. Overall, Black students still have 43 percent lower odds of attaining an associate's or bachelor's degree as compared to White students after accounting for other factors.

¶77 Clearly many students of color in Wisconsin leave high school and enter college with distinct disadvantages. That disparity is not about statistics or mere correlation. Rather, that disparity is about a reality where past state-sponsored racism continues to affect educational opportunities, and systemic racism continues to rob non-White people of equal educational opportunities. And as difficult and uncomfortable as that may be for some to acknowledge, it is the truth, and it cannot and should not be ignored. As Justice Jackson explains, requiring the state to "ignore the initial race-linked opportunity gaps . . . will delay the day that every American has an equal opportunity to thrive, regardless of race." *SFFA*, 600 U.S. at 403 (Jackson, J., dissenting).

---

[6] *Data to Spotlight Disparity*, WIS. DEP'T OF PUB. INSTRUCTION: SPECIAL EDUC., https://dpi.wi.gov/sped/educators/behavior-supports/data-disparity (last visited June 5, 2026).

[7] *Id.*

## II. WISCONSIN STAT. § 39.44

¶78    The legislature sought to bridge some of the gap between White and non-White students with WIS. STAT. § 39.44. The Higher Educational Aids Board (HEAB) is tasked with administering a complicated grant and financial aid system. *See* WIS. STAT. subch. III of ch. 39. A small part of that program provides for minority undergraduate retention grants distributed to students enrolled in eligible private institutions or eligible technical colleges. § 39.44. These grants are intended to help certain racial and national origin minority groups, specifically Black students, Hispanic students, Native American students, and students who are of Laotian, Vietnamese, or Cambodian descent, stay enrolled in school.

¶79    Evidence shows the program has been successful in increasing retention rates. HEAB reported that in recent years, between 77% and 85% of grant recipients either continued in school or completed their degree or certificate. For technical colleges specifically, receipt of a grant at least doubled graduation rates for students who received a grant and tripled graduation rates for Black students who received a grant (from 21.4% graduation rates for Black students who did not receive a grant to 64.4% for those who did). According to HEAB, 85% of grant recipients self-reported that without the grant they would have either dropped out of school or had significant difficulties in remaining.

¶80    Despite this documented success, the grant program's explicit reliance on race is fatal to its constitutionality for the reasons explained in Justice Dallet's concurring opinion.[8] A suggested alternative means of maintaining a grant program to improve retention would be to target individuals who are economically disadvantaged, since there is also a statistical correlation between economic disadvantage and low retention rates. While this alternative aligns with the Supreme Court's ruling in *SFFA*, it falls short because it does not acknowledge the racial inequality underlying the problem. *See SFFA*, 600 U.S. at 388–96 (Jackson, J., dissenting) (detailing the extensive historical race-based gaps beyond just economics, which "still exist today" and "are still stark").

---

[8] Although I recognize that Wisconsin has generally failed to provide equal educational opportunities to those of all races and national origins, I agree with the concurrence that the record in this case does not satisfy the exacting standards of a compelling interest inquiry as espoused in recent jurisprudence.

¶81    At bottom, if we truly want to return to the promise of the Fourteenth Amendment, we must first acknowledge inequalities based on race. Then, we must be willing to accept that the "fault and responsibility to remedy" these inequalities lies "with the government and society that perpetuated" them. *See Johnson*, 401 Wis. 2d 198, ¶175.

### III.  THE REQUEST TO DISMISS THIS CASE

¶82    Before concluding I pause to address a suggestion one of the parties advanced at oral argument—that we dismiss this case as improvidently granted because *SFFA* preordained the outcome and issuing a decision would be "a big waste of taxpayer time."

¶83    Dismissing this case as improvidently granted out of concern for the taxpayers is discordant. We rarely dismiss cases as improvidently granted. We do so "when the issues for which the court took the case are not squarely presented, or when deciding the case will not ultimately result in law development." *Halter v. Wis. Interscholastic Athletic Ass'n*, 2025 WI 10, ¶69, 415 Wis. 2d 384, 19 N.W.3d 58 (Ziegler, J., dissenting). Whether we might serve the taxpayers better by dismissing a case because we agree with the court of appeals' mandate is not part of the calculus.

¶84    Moreover, this court's statutory directive all but obliged us to fully review and issue a decision in this case in service of the people of Wisconsin. This court accepts cases based on the following discretionary statutory criteria:

> CRITERIA FOR GRANTING REVIEW. Supreme court review is a matter of judicial discretion, not of right, and will be granted only when special and important reasons are presented. The following . . . indicate criteria that will be considered:
>
> (a) A real and significant question of federal or state constitutional law is presented.
>
> (b) The petition for review demonstrates a need for the supreme court to consider establishing, implementing or changing a policy within its authority.
>
> (c) A decision by the supreme court will help develop, clarify or harmonize the law, and

1. The case calls for the application of a new doctrine rather than merely the application of well-settled principles to the factual situation; or

2. The question presented is a novel one, the resolution of which will have statewide impact; or

3. The question presented is not factual in nature but rather is a question of law of the type that is likely to recur unless resolved by the supreme court.

(d) The court of appeals' decision is in conflict with controlling opinions of the United States Supreme Court or the supreme court or other court of appeals' decisions.

(e) The court of appeals decision is in accord with opinions of the supreme court or the court of appeals but due to the passage of time or changing circumstances, such opinions are ripe for reexamination.

WIS. STAT. § (Rule) 809.62(1r).

¶85     This case unquestionably called for our review, under at least three of these criteria. First, it presents a real and significant question of state-wide importance warranting review under § 809.62(1r)(a): Can the State of Wisconsin lawfully provide race-based financial aid to technical college students? Second, review is appropriate under § 809.62(1r)(c)(1) because the question in this case involves analysis of how a new set of principles articulated in *SFFA* apply to WIS. STAT. § 39.44.

¶86     Third, review is appropriate under § 809.62(1r)(c)(2). A decision from this court as to the validity of § 39.44 will clarify the law because it raises novel and impactful questions about the extent to which U.S. Supreme Court precedent applies outside the admissions and educational context. In addition, in applying *SFFA*, the court of appeals concluded that *SFFA* applies to government funding beyond education:

> In short, except in the extremely limited and "most extraordinary" circumstances identified in *SFFA . . . government funding or support designed to provide a benefit or cause a detriment to persons based even in part on their race, national origin, or ancestry cannot stand.* Moreover, even in

those limited and extraordinary circumstances, the government funding or support cannot stand without a clear end point.

*Rabiebna v. Higher Educ. Aids Board*, 2025 WI App 24, ¶86, 416 Wis. 2d 44, 20 N.W.3d 742 (emphasis added). These expansive assertions, in a published opinion, broaden the reach of *SFFA*'s conclusions in the educational admissions context far beyond what this case demands. For this reason as well, we appropriately accepted review.

¶87     And our decision today is not a carbon copy of the court of appeals decision. Our narrow ruling—not the sweeping conclusions the court of appeals made about the implications of *SFFA*—is now the law of this state. Our ruling today is the product of time judiciously spent, to the benefit of the people of Wisconsin. I respectfully concur.

RABIEBNA *v.* HIGHER EDUCATIONAL AIDS BOARD
JUSTICE DALLET, concurring

REBECCA FRANK DALLET, J., with whom JILL J. KAROFSKY, C.J., and SUSAN M. CRAWFORD, J., join, concurring.

¶88 The state claims that there are disproportionately high dropout rates among Black, Native American, Hispanic, and certain Southeast Asian students at Wisconsin's private and technical colleges.[1] In an effort to help those students remain in school and graduate, the legislature adopted WIS. STAT. § 39.44 which provides them with need-based grants. Since eligibility for the grants is limited to students only of certain races, national origin, or alienage, the program is subject to strict scrutiny under the Fourteenth Amendment's Equal Protection Clause.[2]

_____

[1] Specifically, eligibility for grants is limited to "minority undergraduates enrolled in private, nonprofit higher educational institutions in this state or in technical colleges in this state." For ease of reference, I will refer to these institutions as "private and technical colleges."

[2] Laws that classify on the basis of race, national origin, or alienage are subject to strict scrutiny, and thus must be narrowly tailored to further a compelling state interest. *See City of Cleburn v. Cleburn Living Ctr.*, 473 U.S. 432, 440 (1985). Insofar as the law conditions eligibility for grants on being Black, Hispanic, or a Laotian, Vietnamese, or Cambodian immigrant to the United States after 1975 (or someone descended from such an individual), the parties rightly agree that the law classifies on the basis of race, national origin, or alienage. *See* § 39.44(1)(a). Native American students are also eligible for the grant program, however, *see id.*, and the United States Supreme Court has never said that classifications on that basis are racial ones subject to strict scrutiny. On the contrary, the Supreme Court has repeatedly "upheld legislation that singles out Indians for particular and special treatment" on the basis that classifications on the basis of Native status are political, not racial, and thus subject only to rational-basis review. *See Morton v. Mancari*, 417 U.S. 535, 554–55 (1974); *see also Haaland v. Brackeen*, 599 U.S. 255, 310 (2023) (Gorsuch, J., concurring) (explaining that the Fourteenth Amendment's reference to "Indians not taxed" "confirmed both the enduring sovereignty of Tribes and the bedrock principle that Indian status is a 'political rather than racial' classification." (quoting *Morton*, 417 U.S. at 553 n.24)). In this case, the parties agree that strict scrutiny applies to § 39.44, and do not develop any argument that we should treat the law differently as a result of its inclusion of Native American students. Nevertheless, nothing in this opinion or the majority opinion should be read as suggesting that classifications on the basis of Native status are racial classifications subject to strict scrutiny.

Plaintiffs, a group of taxpayers argue that the program cannot survive that scrutiny because it is not narrowly tailored to further a compelling state interest.

¶89      I conclude that the Higher Educational Aids Board, the state agency responsible for administering the program, has not met its burden of establishing that § 39.44 is supported by a compelling state interest, and thus that the program is unconstitutional.[3] That is because the record does not support the Board's assertions that there is a real-world problem with dropout rates among the eligible students at Wisconsin's private and technical colleges, or that race, national origin, and alienage cannot be separated from that underlying problem. I write separately to explain this narrow and dispositive conclusion, and because the majority opinion's efforts to subdivide the Board's asserted interest into component parts and reject them piecemeal are unnecessary.

¶90      Although it is half of the traditional strict-scrutiny analysis, the United States Supreme Court has said surprisingly little about what makes an asserted state interest "compelling." *See* Stephen E. Gottlieb, *Compelling Governmental Interests: An Essential But Unanalyzed Term in Constitutional Adjudication*, 68 B.U. L. REV. 917, 932 (1988) ("[W]hile decisions of the Supreme Court . . . have frequently described or treated governmental interests as compelling, few have explained why."). To be sure, the word "compelling" gives us some indication that the asserted interest must be weightier than the merely "legitimate" state interest required for rational-basis scrutiny, or even an "important" state interest, which suffices when intermediate scrutiny applies. *See, e.g.*, Note, *Let the End Be Legitimate: Questioning the Value of Heightened Scrutiny's Compelling- and Important-Interest Inquiries*, 129 HARV. L. REV. 1406, 1408 (2016) (identifying the state interests required under each of the three tiers of constitutional scrutiny). But aside from that, most of the Supreme Court's heightened-scrutiny cases spend little or no time examining the weight of the state's asserted interest. Instead, many cases simply treat it as self-evident that the government has a compelling interest in, for example, ensuring public faith in the judiciary, safeguarding the right to vote, or protecting the public from terrorism or threats of violence. *See, e.g.*, *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 447 (2015); *Eu v. San Francisco Cnty.*

---

[3] Additionally, I agree with the majority that Plaintiffs have standing, and therefore join ¶¶17–20 of the majority opinion.

*Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989); *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 28 (2010); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992). In these cases, and others like them, the Supreme Court moves quickly from labeling the asserted state interest "compelling" to analyzing whether the law at issue is narrowly tailored to further that interest—the second prong of the strict-scrutiny analysis.

¶91 The Supreme Court has devoted more attention to the compelling-interest prong, however, in race-based Equal Protection challenges. To date, the Court has recognized two compelling interests that can justify narrowly tailored race-conscious laws or governmental policies: (1) preventing race riots in prisons, and (2) remedying identifiable past instances of discrimination. *See Johnson v. California*, 543 U.S. 499, 512–13 (2005); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 505 (1989). Importantly, the Court's recognition of these interests as compelling in race-based Equal Protection challenges rested on the underlying factual record, and specifically whether that record established both that there was a real-world problem the race-conscious law or policy sought to address, and that race could not be separated from that underlying problem. *See Johnson*, 543 U.S. at 502 (discussing the "numerous incidents of racial violence" in California prisons, and data about racial gangs in prison); *Croson*, 488 U.S. at 498–504 (citing the lack of evidence of past racial discrimination as a reason to reject a quota system for public contracting); *see also Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996) (requiring the state have "'a strong basis in evidence' to conclude that remedial action [is] necessary" before adopting a race-conscious remedy in redistricting (quoting another source)). In other words, the reason a state had a compelling interest in a race-based prison housing policy was in part because it demonstrated that existing racial tensions posed serious safety risks. *See Johnson*, 543 U.S. at 512. Relatedly, the existence of a compelling state interest in adopting a race-based remedy for past discrimination depended on a showing of specifically identifiable instances of racial discrimination against individuals. *See Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 763 (1976). And in both of these situations, race could not be separated from the underlying problem; race was the reason behind the imminent risk of violence in prisons and the prior discrimination against specific individuals. *See, e.g., Johnson*, 543 U.S. at 512; *Franks*, 424 U.S. at 763.

¶92 Likewise, the Court has also repeatedly rejected asserted state interests as not compelling when the state lacked evidence of the underlying problem it sought to address, or failed to show that race (or alienage) could not be separated from that problem. For example, the Court

concluded that a generalized interest in remedying "past societal discrimination" was not compelling because it was based on "sheer speculation," and could not "in any realistic sense be tied to any injury suffered by anyone." *See Croson*, 488 U.S. at 499; *see also Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 731 (2007) ("[R]emedying past societal discrimination does not justify race-conscious government action." (collecting cases)). Similarly, in rejecting a Texas law prohibiting non-citizens from serving as notaries public, the Court concluded the state's asserted interests in ensuring familiarity with state law and notaries' availability for testimony in later proceedings were not compelling. *See Bernal v. Fainter*, 467 U.S. 216, 227–28 (1984). The reason why, the Court explained, was that Texas had no evidence that non-citizens could not familiarize themselves with state law or that "the unavailability of notaries' testimony presents a real, as [o]pposed to a merely speculative, problem to the State." *Id.*

¶93    The upshot of these cases is that in order for an asserted state interest to be compelling enough to support a race-based (or alienage- or national-origin-based) law or policy, it must be grounded on more than just speculation or unfounded empirical assumptions. Instead, a state has a such a compelling interest only if it establishes, at a minimum, that there is a real-world problem and that race (or alienage, or national origin) cannot be separated from that problem.[4]

¶94    In this case, the Board argues that the grant program is supported by a compelling state interest because there is a problem with dropout rates at Wisconsin's private and technical colleges, and that race cannot be separated from that problem because the eligible Black, Native American, Hispanic, and Southeast Asian students are the ones who are dropping out of those schools at disproportionately high rates. That argument fails, however, because at no point in time—when § 39.44 was first adopted, when it was amended two years later, or in the decades since when the legislature has continued to fund the program in each biennial budget—is there evidence in the record that students in the eligible groups

---

[4] Of course, such a race-based (or national-origin or alienage-based) law or policy might not survive strict scrutiny for other reasons. For example, even if the government successfully establishes a compelling state interest, the law or policy being reviewed still must be narrowly tailored to further that compelling interest. *See, e.g., Johnson*, 543 U.S. at 512.

were (or still are) dropping out of Wisconsin's private and technical colleges at disproportionately high rates.

¶95 When the legislature first adopted the grant program in 1985 Wis. Act 29, it did so based on two reports: (1) a 1984 report by a joint committee created by the Superintendent of Public Instruction and University of Wisconsin System President "to study cooperative ways of eliminating or reducing causes leading to under-enrollment of minority students and to study factors affecting retention in post-secondary education;" and (2) a subsequent study conducted by the legislature itself. These reports focused only on data from the University of Wisconsin System, however, and included no information about retention rates for students enrolled in private colleges. Indeed, when discussing the prospect of creating a grant program for certain minority students enrolled in private colleges, the legislature's report acknowledged that "no evaluation of need [for such a grant program] has been made." Further, while the legislature's report included data about *enrollment* rates of various student populations, it contained no information about *retention* rates and acknowledged that "[n]o data is available which indicates the need levels of the target population." Thus, while these sources may have something to say about enrollment or retention at Wisconsin's public universities, they do not show that students in the eligible groups were dropping out of Wisconsin's private colleges at disproportionately high rates.

¶96 The legislature similarly lacked data showing disproportionate attrition rates when, two years later, it expanded eligibility for grants under § 39.44 to students at technical colleges and to certain Southeast Asian students. *See* 1987 Wis. Act 27. Again, the 1987 legislative report about those amendments included only data regarding technical college enrollment, not retention. Moreover, the report provided no empirical support for its assertions that "[a]lthough Asians in general have high attendance and completion rates, these statistics may not be representative of particular subgroups within the Asian population," and "Southeast Asian refugees have been identified as a disadvantaged group." In fact, the report made clear that "[d]ata [about enrollment rates] is not available from private colleges."

¶97 Data collected in the decades since § 39.44 was adopted fails to fill these gaps, or demonstrate the existence of disproportionate attrition rates among Black, Native American, Hispanic, and certain Southeast Asian students at Wisconsin's private and technical colleges. To be sure, annual reports prepared by the Board demonstrate that the program is effective in

the sense that students who receive grants are far more likely to graduate from college than those who are eligible for grants but don't get them. But those reports do not include data on retention rates for all students at Wisconsin's private and technical colleges, or for all such students with financial need.[5] Without that baseline information, these reports provide no support for the Board's claim that attrition rates are disproportionately higher among the groups eligible to receive grants under § 39.44.

¶98    To summarize, when § 39.44 was first adopted in 1985, and when it was expanded in 1987, the legislature had no basis on which to conclude that the eligible students were, in fact, dropping out of Wisconsin's private and technical colleges at disproportionate rates, let alone that they were doing so for financial reasons. Although data from the decades since supports the conclusion that the program reduces attrition rates among students who receive the grants, that data also provides no basis for concluding that Black, Hispanic, Native American, and certain Southeast Asian students are dropping out of Wisconsin's private and technical colleges at disproportionate rates. In short, there is no evidence in the record establishing a problem with retention at Wisconsin's private and technical colleges, or that race cannot be separated from that problem because the eligible Black, Native American, Hispanic, and Southeast Asian students are the ones who are dropping out of those schools at disproportionately high rates. Without that evidence, the Board cannot meet its burden of establishing that § 39.44 is supported by a compelling

---

[5] The Board also cites to nationwide retention statistics for students who entered public two- and four-year universities and private non-profit four-year universities in Fall 2011. At public two-year institutions, less than 40% of all students completed a degree or certificate within six years. The completion rate varies meaningfully by race, however, with 46.7% of White students and 46.8% of Asian students completing a degree or certificate within six years, compared to 35% of Hispanic students and just 26% of Black students. At private non-profit four-year universities, full-time Black (77.6%) and Hispanic (87.6%) students complete degrees at lower rates than students from all groups (88.5%), and White students (92.5%). Nevertheless, these statistics are not specific to Wisconsin, do not include retention rates for all of the groups eligible for grants under § 39.44 (the report contains no data regarding Native American students or eligible Southeast Asian students), and do not isolate data from technical colleges. As a result, this report provides little or no support for the Board's assertion that Wisconsin students who are eligible for grants under § 39.44 have "disproportionately high attrition" at Wisconsin's private and technical colleges.

interest, and the program must therefore be struck down as unconstitutional.

¶99 This conclusion is dispositive. Whether the interest underlying § 39.44 is framed generally as reducing disproportionate dropout rates, or broken down into separate interests like equalizing educational opportunity and promoting diversity through improving student retention, the result is the same. *See* majority op., ¶¶45–47 (dividing the Board's asserted state interest into several distinct interests). Without empirical support in the record for the existence of the underlying problem and the fact that race cannot be separated from that problem, the Board cannot establish the existence of a compelling state interest, no matter how that interest is framed. *See, e.g., Johnson*, 543 U.S. at 512; *Croson*, 488 U.S. at 499; *Bernal*, 467 U.S. at 227–28. For this reason, the majority opinion's efforts to subdivide the Board's asserted interest into component parts and reject them piecemeal are unnecessary. *See* majority op., ¶45–50. All that needs to be said is that the Board failed to meet its burden of establishing a compelling state interest in this case.

¶100 My conclusion that the Board failed to meet its burden of establishing a compelling state interest is required under the United States Supreme Court's cases, which are binding on this court, and which interpret the Equal Protection Clause as imposing substantial barriers to the adoption of race-conscious laws—even ones that seek to remedy the deep, structural inequalities in our society. Nothing about that interpretation was inevitable though, or compelled by the text or history of the Fourteenth Amendment. The Congress that adopted the Fourteenth Amendment, after all, "reject[ed] 'proposals that would have made the Constitution explicitly color-blind,'" and instead chose to adopt the language of "equal protection," which "does not impose a blanket ban on race-conscious policies." *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 322 (2023) (Sotomayor, J., dissenting) (quoting ANDREW KULL, THE COLOR-BLIND CONSTITUTION 69 (1992)). Reinforcing that conclusion, "[s]imultaneously with the passage of the Fourteenth Amendment," that same Congress enacted numerous race-conscious policies like the Freedmen's Bureau Act, and the Civil Rights Act of 1866, which were designed to "fulfill the Amendment's promise of equality." *See id.* at 322–25. Although the Supreme Court has, in recent years, focused on history and tradition when interpreting other parts of the Constitution, it has given the Equal Protection Clause's history short shrift. *See, e.g., United States v. Rahimi*, 602 U.S. 680, 691–92 (2024) (analyzing the Second Amendment's text and history). Rather than read the Equal Protection

Clause consistent with its history and purpose of achieving racial equality, the Court has instead treated the Clause as a rule that entrenches inequality by prohibiting legislation designed to remedy it. *See Students for Fair Admissions*, 600 U.S. at 341 (Sotomayor, J., dissenting).

¶101   Nevertheless, there is still some room for optimism. If the Supreme Court considers it self-evident that the government has a compelling interest in, for example, preserving "public confidence in judicial integrity," or "protecting the integrity of the Medal of Honor," then it certainly ought to conclude that states have a compelling interest in ensuring that all of their students—regardless of race, national origin, alienage, or anything else—stay in school and complete their education. *See Williams-Yulee*, 575 U.S. at 447; *United States v. Alvarez*, 567 U.S. 709, 725 (2012). Indeed, as the Court put it in *Brown v. Board of Education of Topeka*, "it is doubtful that any child may reasonably be expected to succeed in life if he [or she] is denied the opportunity of an education."[6] The state's interest in ensuring equal access to educational opportunity is no less meaningful when the barriers to obtaining a degree today may be financial, rather than legal or social. Despite Plaintiffs' counsel's assertions at oral argument to the contrary, the Supreme Court has never said that two and *only two* compelling interests—preventing race riots and remedying past instances of discrimination against specific individuals—could ever justify race-conscious government policies. *See Students for Fair Admissions*, 600 U.S. at 207. Thus, while the Board here failed to demonstrate a compelling interest in adopting § 39.44 to address disproportionately high attrition rates among Black, Hispanic, Native American, and certain Southeast Asian students at Wisconsin's private and technical colleges, the result may be different for other laws with greater factual support. Accordingly, I respectfully concur.

---

[6] 347 U.S. 483, 493 (1954).